## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| SURYANARAYANAN RANGANATHAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WILDHORSE RESOURCE DEVELOPMENT CORPORATION, JAY C. GRAHAM, ANTHONY BAHR, BRIAN A. BERNASEK, JONATHAN M. CLARKSON, SCOTT A. GIESELMAN, DAVID W. HAYES, STEPHANIE C. HILDEBRANDT, GRANT E. SIMS, MARTIN W. SUMNER, TONY R. WEBER, COLEBURN INC., and CHESAPEAKE ENERGY CORPORATION,<br><br>Defendants, | Civil Action No. _____<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934<br><br>JURY TRIAL DEMAND |

## CLASS ACTION COMPLAINT

Plaintiff Suryanarayanan Ranganathan ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of the public stockholders of WildHorse Resource Development Corporation ("WildHorse" or the "Company") against WildHorse's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9,

17 C.F.R. 240.14a-9, arising out of the Board's attempt to sell the Company to Chesapeake Energy Corporation through its wholly-owned subsidiary Coleburn Inc. (collectively "Chesapeake Energy").

2. Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading proxy statement to be filed with the Securities and Exchange Commission ("SEC") on December 26, 2018 (the "Proxy"). The Proxy recommends that WildHorse shareholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby WildHorse is acquired by Chesapeake Energy. The Proposed Transaction was first disclosed on October 30, 2018, when WildHorse and Chesapeake Energy announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Chesapeake Energy will acquire all of the outstanding shares of common stock of WildHorse in a mix of cash and stock. Shareholders can elect to either receive 5.989 shares of Chesapeake Energy stock or 5.336 in stock and $3.00 in cash. The deal is valued at approximately $3.97 billion and is expected to close in the first half of 2019.

3. As described in further detail herein, the directors affiliated with WildHorse's majority shareholders dominated the process by which the Proposed Transaction was approved. Including defendants who have potentially continuing employment interests in the new combined company. Also, the Board agreed to the Merger Consideration despite the absence of a collar to protect against downward movement by Chesapeake Energy's troubled stock. Moreover, even the valuation analyses generated by the financial advisors to the Board indicated that the offer price was considerably below the price targets of analysts following the Company. Finally, the analyses performed by the financial advisor to the buyer, Chesapeake Energy, also indicated value ranges for WildHorse well in excess of the offer price.

2

4.     Furthermore, the Proxy is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning the sales process, financial projections prepared by WildHorse management, as well as the financial analyses conducted by Tudor Pickering Holt & Co ("TPH") and Morgan Stanley & Co. LLC ("Morgan Stanley"), WildHorse's financial advisors.

5.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing an amendment to the Proxy with the SEC or otherwise causing an amendment to the Proxy to be disseminated to WildHorse's shareholders, unless and until the material information discussed below is included in any such amendment or otherwise disseminated to WildHorse's shareholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

## PARTIES

6.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of WildHorse.

7.     Defendant WildHorse is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 9805 Katy Freeway, Suite 400, Houston, Texas 77024. WildHorse common stock trades on NYSE under the ticker symbol "WRD."

8.     Defendant Jay C. Graham has been CEO, Chairman of the Board and a director of

the Company since September 2016. Defendant Graham served as Co-Founder and Co-CEO of WildHorse from June 2013 to January 2016, and as President of WildHorse Resources Management Company from October 2012 to January 2016. In addition, Defendant Graham is an investor, along with NGP, in an entity that holds 21% of WildHorse's outstanding stock.

9.      Defendant Anthony Bahr has been President and a director of the Company since 2016. Defendant Bahr has served as CEO of WildHorse Resources Management Company since October 2012. Defendant Bahr served as Co-Founder and Co-CEO of WildHorse from June 2013 to August 2016. In addition, Defendant Bahr is an investor, along with NGP, in an entity that holds 21% of WildHorse's outstanding stock.

10.      Defendant Brian A. Bernasek has been a director of the Company since 2017. Defendant Bernasek is a managing director of The Carlyle Group, and previously worked at Morgan Stanley & Co., in its Investment Banking Division.

11.      Defendant Jonathan M. Clarkson has been a director of the Company since 2016.

12.      Defendant Scott A. Gieselman has been a director of the Company since 2016. Defendant Gieselman is a partner for Natural Gas Partners ("NGP").

13.      Defendant David W. Hayes has been a director of the Company since 2016. Defendant Hayes is a partner for NGP.

14.      Defendant Stephanie C. Hildebrandt has been a director of the Company since 2017.

15.      Defendant Grant E. Sims has been a director of the Company since 2017.

16.      Defendant Martin W. Sumner has been a director of the Company since 2017. Defendant Sumner is a managing director of The Carlyle Group.

17.      Defendant Tony R. Weber has been a director of the Company since 2016.

4

Defendant Weber is managing partner and chairman of the executive committee for NGP.

18.     Defendants Graham, Bahr, Bernasek, Brannon, Clarkson, Gieselman, Hayes, Hildebrandt, Sims, Sumner and Weber are collectively referred to herein as the "Board."

19.     Defendant Chesapeake Energy Corporation is an Oklahoma corporation with its principal executive offices located at 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

20.     Defendant Coleburn Inc. is a Delaware corporation and is a wholly owned subsidiary of Chesapeake Energy Corporation.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

22.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) a significant amount of the conduct at issue took place and had an effect in this District; and (ii) WildHorse is incorporated in this District.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of WildHorse common stock and their successors in interest and/or their transferees, except

Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

25.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. As of October 26, 2018, WildHorse had approximately 101.9 million shares outstanding.

(b)     Questions of law and fact are common to the Class, including, inter alia, the following:

(i)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(ii)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

(iii)   Whether Plaintiff and other members of the Class would suffer irreparable injury were Defendants to file an amendment to the Proxy with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated;

(iv)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

(v)     whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

(c)      Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)      Plaintiff's claims are typical of those of the other members of the Class.

(e)      Plaintiff has no interests that are adverse to the Class.

(f)      The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)      Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)      Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Background

26.      WildHorse was formed as a holding company for the assets and operations of WildHorse Resources II, LLC and Esquito Resources II, LLC. WildHorse Resources II, LLC was founded in 2013 by affiliates of NGP and Defendants Bahr and Graham, and Esquisito was founded in 2014. Both companies were controlled by NGP and Defendants Bahr and Graham by 2015, and the companies merged in 2016. Since the Company went public in 2016, NGP has held a majority of WildHorse's outstanding common stock, and in a recent Schedule 14A Proxy Statement filed with the SEC on April 2, 2018, the Company acknowledged that it was a controlled company.

27.    NGP owned approximately 53.5% of voting power, while The Carlyle Group holds 24.2% of voting power.

28.    On October 16, 2017, the Board entered into the Merger Agreement with Chesapeake Energy and Merger Sub.

**B.  The Proposed Transaction is Unfair to Stockholders**

29.    WildHorse has been enjoying a consistent upward trend in its revenues. Sales revenue grew from $122.49 million in the quarter ending September 30, 2017 to $259.49 million on September 30, 2018. EBITDA grew at a similar pace.

30.    However, Chesapeake Energy has been suffering through a starkly different trend. It's stock has lost 90% of its value in a five year span. It's production is heavily weighted towards natural gas, which been much less profitable than crude oil and natural gas liquids. Also, at the end of September 2018 it had $9.3 billion in debt. And it's stock price has cratered since the announcement of the Proposed Transaction.

31.    Given that the consideration offered is a mix of stock and cash and that there is no protective collar on the exchange ratio and the perilous state of Chesapeake stock, WildHorse shareholders are being presented with a very unpalatable proposition.

32.    The price offered, which at the trading rates of Chesapeake stock on December 28, 2018, amounts to only $12.87 per WildHorse share if a shareholder elects to receive all stock. This is significantly below WildHorse's 52 week trading high of $29.67.

33.    Also, the average analyst price target for WildHorse is $34.00, ranging from $30.00 to $42.00. The average is therefore almost triple Chesapeake's current offer price.

34.    Chesapeake acknowledges that the addition of WildHorse will transform it's portfolio and materially increase it's oil production, as well as providing significant EBITDA

margin accretion. Clearly none of this is reflected in the derisory offer price.

35.     Also, WildHorse shareholders can have no faith in the process conducted by the Board leading to the Proposed Transaction. Negotiations were led by defendant Graham who is an investor in the entity holding 21% of WildHorse stock, along with NGP, and whose interests are not aligned with the interests of public shareholders. He also may have a continuing employment interest in the new entity further clouding his objectivity. Additionally, as detailed below, he stands to reap huge benefits personally from the consummation of the Proposed Transaction.

36.     The process undertaken by the Board was rife with conflicts and the outreach to other potential bidders was half hearted at best. Also, despite the plain conflicts suffered by several Board members no special committee of independent directors was formed to oversee the process. Also, even though the controlling shareholders can guarantee passage of a yes vote through their votes alone, no majority of the minority condition is included to protect the rights of the minority shareholders.

**C. WildHorse's Officers Stand to Receive Benefits Unavailable to the Class**

37.     The Proxy acknowledges that the Company's executive officers have interests in the merger that may differ from those of the stockholders and may create conflicts of interest.

38.     Restricted stock awards that have been awarded to and are held by WildHorse's executive officers will vest and be converted into the right to receive either the Merger Consideration or another amount. The treatment of these equity awards, in addition to benefits provided to executive officers through the WildHorse Executive Change in Control and Severance Benefit Plan, will create a windfall for WildHorse's executive officers that is unavailable to the common stockholders. As demonstrated in the following chart, the executive officers of WildHorse in total stand to receive up to $48.4 million, if they are let go without "cause" or

9

voluntarily leave for "good reason" after the Proposed Transaction closes:

|  | Cash | Equity | Benefits | Total |
|---|---|---|---|---|
| Jay C. Graham | $5,075,655 | $7,179,871 | $65,808 | $12,321,334 |
| Anthony Bahr | $5,075,655 | $6,789,763 | $65,808 | $11,931,226 |
| Andrew J. Cozby | $2,528,055 | $6,253,174 | $54,840 | $8,836,069 |
| Steve Habachy | $2,528,055 | $3,906,503 | $54,840 | $6,489,398 |
| Kyle N. Roane | $2,528,055 | $6,253,174 | $54,840 | $8,836,069 |

### D.  The Preclusive Deal Protection Devices

39.  As part of the Merger Agreement, Defendants agreed to certain preclusive deal protection devices that ensure that no competing offers for the Company will emerge.

40.  By way of example, section 6.3(b) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting or encouraging the submission of an acquisition proposal. Section 6.3(a) demands that the Company cease and terminate all solicitations, discussions or negotiations with any party concerning an acquisition proposal.

41.  Despite already locking up the Proposed Transaction by agreeing not to solicit alternative bids, the Board consented to additional provisions in the Merger Agreement that further guarantee the Company's only suitor will be Chesapeake Energy. For example, pursuant to section 6.3(d) of the Merger Agreement, the Company must notify Chesapeake Energy of any offer, indication of interest, or request for information made by an unsolicited bidder. Thereafter, should the Board determine that the unsolicited offer is superior, section 6.3(e)(iii) requires that the Board grant Chesapeake Energy three (3) business days to negotiate the terms of the Merger Agreement to render the superior proposal no longer superior. Chesapeake Energy is able to match the unsolicited offer because, pursuant to section 6.3(d) of the Merger Agreement, the Company must provide Chesapeake Energy with the identity of the party making the proposal and the material terms of the superior proposal, eliminating any leverage that the Company has in receiving the unsolicited offer.

42.     In other words, the Merger Agreement gives Chesapeake Energy access to any rival bidder's information and allows Chesapeake Energy a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse for WildHorse, because the Merger Agreement unfairly assures that any "auction" will favor Chesapeake Energy and allow Chesapeake Energy to piggy-back upon the due diligence of the foreclosed second bidder.

43.     In addition, pursuant to section 8.3(b) of the Merger Agreement, WildHorse must pay Chesapeake Energy a termination fee of $85 million if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

44.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of Chesapeake Energy's inadequate offer price.

### E.  The Materially Incomplete and Misleading Proxy

45.     The Individual Defendants owe the stockholders a duty of candor. They must disclose all material information regarding the Proposed Transaction to WildHorse stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

46.     On December 26, 2018, Defendants filed the Proxy with the SEC. The purpose of

the Proxy is, inter alia, to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, WildHorse shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

### Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts

47.     The Proxy discloses management-prepared financial projections for the Company which are materially misleading. The Proxy indicates that in connection with the rendering of TPH and Morgan Stanley's fairness opinions, TPH reviewed "certain financial projections for WildHorse prepared by the management of WildHorse and certain financial projections for Chesapeake [Energy] prepared by the management of Chesapeake [Energy] as modified by the management of WildHorse" and Morgan Stanley reviewed "certain internal financial statements and other financial and operating data concerning WildHorse and Cheasapeake [Energy]." Accordingly, the Proxy should have, but failed to, provide certain information in the projections that WildHorse's management provided to the Board, TPH and Morgan Stanley.

48.     Notably, Defendants failed to disclose the financial projections for each of WildHorse and Chesapeake Energy for fiscal years 2019 to 2023 for:

(a)     Production by product and reserve classification / development stage;

(b)     Revenue by product and reserve classification / development stage;

(c)     Operating expenses, by line item as shown in SEC filings;

(d)     EBITDAX (for CHK);

(e)     Exploration expense;

(f)     Stock-based compensation expense;

(g)     Any other line items used in the calculation of unlevered cash flow, as used in the DCF analyses of TPH and Morgan Stanley;

(h)     Unlevered cash flow, as used in the DCF analyses of TPH and Morgan
Stanley;

(i)     Full projections, through the end of their economic lives, for each of WRD's
and CHK's assets, as used in the NAV analyses of TPH and Morgan
Stanley;

(j)     Estimated effects of hedging, as used in the NAV analyses of TPH and
Morgan Stanley; and

(k)     General and administrative expense and taxes, as used in the NAV analyses
of TPH and Morgan Stanley.

The Proxy also fails to disclose the synergies expected from the Proposed Transaction that were

prepared by WildHorse's management and reviewed by TPH (and called the "WildHorse

Synergies" in the Proxy). This omitted information is necessary for WildHorse stockholders to

make an informed decision on whether to vote in favor of the Proposed Transaction.

### *Materially Incomplete and Misleading Disclosures Concerning TPH and Morgan Stanley's Financial Analyses*

49.     With respect to the *Discounted Cash Flow Analysis,* the Proxy fails to disclose the

individual inputs and assumptions utilized by TPH and Morgan Stanley to derive the discount rate

range of 8.0% to 10.0%, as used for both WildHorse and Chesapeake Energy. The Proxy also fails

to disclose the ranges of implied perpetuity growth rates for each of WildHorse and Chesapeake

Energy that resulted from the analysis. Finally, the Proxy fails to disclose the definition of

unlevered cash flow, as used by TPH and Morgan Stanley for each of WildHorse and Chesapeake

Energy.

50.     With respect to the *Net Asset Value Analysis*, the Proxy fails to disclose the

individual inputs and assumptions utilized by TPH and Morgan Stanley to derive the discount rate

range of 8.0% to 10.0%, as used for both WildHorse and Chesapeake. The Proxy also fails to

disclose the concluded values of: (1) the present value of the cash flows generated by each of the

13

estimated proved reserves, unproved reserves and undeveloped hydrocarbon resources; (2) the present value of the estimated effects of hedging; (3) the present value of the effects of general and administrative expense and income tax; (4) net debt; and (5) preferred stock.

51.     With respect to the *Comparable Company Analysis,* the Proxy fails to disclose whether TPH and Morgan Stanley performed any type of benchmarking analysis for each of WildHorse and Cesapeake in relation to the selected public companies.

52.     With respect to the *Selected Precedent Transactions Analysis*, the Proxy fails to disclose the individually observed metrics and multiples for each of the selected transactions, including: (a) enterprise value as a multiple of proved reserves; (b) enterprise value as a multiple of estimated production; (c) enterprise value as a multiple of current, FY-1 and FY-2 EBITDAX; (d) transaction value per adjusted net acre; and (e) percent equity consideration. Additionally, the Proxy fails to disclose the inputs, assumptions and/or methodologies used to determine the transaction value adjustments per oil boe and gas boe used by TPH and Morgan Stanley. Finally, the Proxy fails to disclose the definition of transaction value adjustment based on future cash flows from production, a description of why this adjustment is necessary, and the actual amount of the adjustment used by TPH and Morgan Stanley.

### Materially Incomplete and Misleading Disclosures Concerning the Flawed Process

53.     The Proxy also fails to disclose material information concerning the sales process. For example, TPH and Morgan Stanley made a number of presentations to the Board, yet those presentations were not disclosed in the Proxy. This includes: the presentation made to the Board on September 21, 2018; the discussion of certain financial information at the September 23, 2018 Board meeting; the discussion of certain updated financial information at the Board meeting on September 25, 2018; the discussion of certain updated financial information at the September 26,

2018 Board meeting; the discussion of certain updated financial information at the Board meeting on October 4, 2018; the review of certain updated financial information at the Board meeting on October 9, 2018; and the review of updated financial information at the October 28, 2018 Board meeting.

54.     The Proxy discusses various financial projections discussed with the Board, NPG, Chesapeake Energy, and/or TPH and Morgan Stanley, yet those projections were not disclosed in the Proxy. That includes the financial model and projections discussed on September 18, 2018; the guidance regarding financial projections and future development activity discussed between WildHorse management, Chesapeake Energy management and TPH and Morgan Stanley on September 22, 2018;  the Company's near-term and long-term plans as a standalone company as discussed at the October 4, 2018 Board meeting; and the financial projections of the combined company discussed with the Board at the meeting on October 5, 2018.

55.     The Proxy notes that Defendant Graham contacted the CEO of Company B to inquire into Company B's interest in a merger with WildHorse. However, the Proxy does not disclose whether the Board authorized Defendant Graham to make the inquiry, or whether the Board was aware such an inquiry had been made.

56.     The Proxy fails to state whether the confidentiality agreement WildHorse entered into with Company B was still in effect during the sales process and whether that agreement contains a DADW standstill provision that precludes Company B from making a topping bid for the Company. The disclosure of the terms of any standstill provisions is crucial to WildHorse stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company.

15

57.     On September 4, 2018, the Board determined to retain TPH, Morgan Stanley and Guggenheim Securities LLC as financial advisors. Yet fairness opinions were only provided by TPH and Morgan Stanley. The Proxy does not disclose the basis for the Board's not obtaining a fairness opinion from Guggenheim, and when such a decision was made. In addition, the Proxy does not disclose any services performed by Guggenheim for other interested parties and the amount of  compensation received for such services.

58.     The Proxy also fails to disclose key information concerning the Company's financial advisors. For example, the Proxy notes that Morgan Stanley had served as a financial advisor in a transaction involving WildHorse management and several members of the WildHorse board. Yet in its description of Morgan Stanley's previous relationship with WildHorse, the Proxy only states that Morgan Stanley provided financial advisory and financing services to Carlyle and its related entities. More information about the transaction involving management and board members of WildHorse, and Morgan Stanley's role, is crucial for determining if Morgan Stanley is subject to any conflicts of interest. This is especially important given that Morgan Stanley received between $50 million and $70 million from Carlyle and its related entities just in the past two years.

59.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, WildHorse stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

60.     In addition, the Individual Defendants knew or recklessly disregarded that the

16

Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

61.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so. The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

62.     Further, the Proxy indicates that on October 29, 2018, TPH and Morgan Stanley reviewed with the Board their financial analysis of the Merger Consideration and delivered to the Board oral opinions, which were confirmed by delivery of written opinions of the same date, to the effect that the Merger Consideration was fair, from a financial point of view, to WildHorse shareholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning TPH's and Morgan Stanley's financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

63.     Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9**

64.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

65.     Defendants have filed the Proxy with the SEC with the intention of soliciting WildHorse shareholder support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

66.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of WildHorse, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

67.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

68.     Specifically, and as detailed above, the S-4 violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of WildHorse shares and the financial analyses performed by TPH and Morgan Stanley in support of their fairness opinions; and (iii) the sales process.

69.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and

recommend the Proposed Transaction; indeed, the Proxy states that TPH and Morgan Stanley reviewed and discussed their financial analyses with the Board during various meetings including on October 29, 2018, and further states that the Board relied upon TPH's and Morgan Stanley's financial analyses and fairness opinions in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

70.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.     The Individual Defendants acted as controlling persons of WildHorse within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of WildHorse and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

19

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

73.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

75.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

76.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

77.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these

defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing an amendment to the Proxy with the SEC or otherwise disseminating an amendment to the Proxy to WildHorse shareholders unless and until Defendants agree to include the material information identified above in any such amendment;

C.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D.      In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

E.      Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 4, 2019

**RIGRODSKY & LONG, P.A.**

By: */s/ Brian D. Long*
  Brian D. Long (#4347)

**OF COUNSEL:**
  Gina M. Serra (#5387)
**ROWLEY LAW PLLC**
  300 Delaware Avenue, Suite 1220
Shane T. Rowley
  Wilmington, DE 19801
Danielle Rowland Lindahl
  Telephone: (302) 295-5310
50 Main Street, Suite 1000
  Facsimile: (302) 654-7530
White Plains, NY 10606
  Email: bdl@rl-legal.com
Tel: (914) 400-1920
  Email:gms@rl-legal.com
Fax: (914) 301-3514

  *Attorneys for Plaintiff*